UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
BERNARDO MEJIAS GONZALEZ, *pro se*,

                Plaintiff,

         -against-

MICHAEL J. ASTRUE,[1] Commissioner of
Social Security,

                Defendant.
------------------------------------------------------------ x

**Memorandum and Order**

06-cv-5403 (DLI)

**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Bernardo Mejias Gonzalez ("Plaintiff") filed an application for Supplemental Security Income under the Social Security Act (the "Act") on May 21, 2004. The Commissioner of the Social Security Administration ("Commissioner") denied plaintiff's application initially and on reconsideration. Plaintiff testified at a hearing held before an Administrative Law Judge ("ALJ") on December 27, 2005. By decision dated July 16, 2006, the ALJ concluded that plaintiff was not disabled within the meaning of the Act. On September 15, 2006, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review. Plaintiff filed the instant action to obtain judicial review of the Commissioner's decision, pursuant to 42 U.S.C. § 405(g). The Commissioner now moves for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), seeking to affirm the ALJ's finding that plaintiff's seizure disorder did not prevent him from engaging in substantial gainful activity.

As set forth more fully below, the court finds that the ALJ applied the correct legal

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Michael J. Astrue shall be substituted for Commissioner Jo Anne B. Barnhart as the defendant in this action.

standard and reached a decision that is supported by substantial evidence in the record. Plaintiff's impairment does not meet the listing requirement in Appendix 1 of 20 C.F.R. Part 404, Subpart P ("Appendix 1") and he retains the residual functional capacity to perform work that exists in significant numbers in the national economy. The Commissioner's motion is granted.

## I. Background

### A. Medical History

#### 1. Incidents and Frequency of Seizures

Plaintiff suffers from a chronic history of grand mal seizures[2] since the age of three when he experienced his first seizure during a high fever. (*See* Administrative Transcript ("Tr."), Docket Entry No. 8, at 98, 69.) He claimed on his SSI application that he experienced seizures once or twice a week. (Tr. 70.) However, he has also claimed that, though he experienced seizures twice or thrice daily day or night, he has been seizure-free for as long as two months. (Tr. 123; *see also* Tr. 70.)

The record reflects both documented and undocumented episodes of seizures. In 1982, plaintiff, then eight years old, suffered an epileptic attack after discontinuing his medication. (Tr. 98, 100.) An unsigned page of medical remarks dated January 23, 1991 noted that plaintiff was epileptic and had seizures four days prior. (Tr. 97.) On April 9, 2004, he arrived at St. Mary's Hospital ("St. Mary's") in a stretcher after a seizure episode. (Tr. 104-05.) During his eleven-day inpatient stay, he exhibited no symptoms of seizure activity and was "in no acute distress." (Tr. 104-11.) He claimed to have experienced six seizures in May 2004, but those seizures are

---

[2] "A grand mal seizure, also known as a tonic-clonic seizure, features a loss of consciousness and violent muscle contractions. They are caused by abnormal electrical activity throughout the brains, so signs and symptoms typically involve the entire body." Mayo Clinic Staff, *Grand mal seizure*, MayoClinic.com, June 22, 2007, http://www.mayoclinic.com/health/grand-mal-seizure/DS00222.

2

undocumented in the record. (Tr. 70-71.) Following his hospitalization at St. Mary's, Plaintiff sought treatment for his seizures at the emergency room at Wyckoff Heights Medical Center ("Wyckoff ER") five times in 2004. (Tr. 135-41.) After a nine-month gap, he returned to the Wyckoff ER three more times in 2005. (Tr. 152-53, 158.) However, his six-day stay at Wyckoff in December 2005 was precipitated by gastroenteritis. (Tr. 158.) While he testified that he experienced four seizures during this stay, these seizures are also undocumented in the record. (Tr. 158, 171.) In an undated report subsequent to the December 2005 Wyckoff report, Dr. Siddharth Pandya reported that Plaintiff related having a seizure episode five days earlier. (Tr. 159.)

### 2. Medication

Plaintiff has been prescribed antiepileptic medication for many years. (Tr. 51, 90-91, 96.) In 2004 and 2005, he received prescriptions for 200 mg of Dilantin and 200 mg of Tegretol when he was discharged from St. Mary's and Wyckoff. (Tr. 93-94, 136-41, 152-56, 160, 164.) The prescribing doctor increased his prescription for Tegretol from 200 mg to 400 mg in November 2005 due to decreased concentrations of Tegretol in plaintiff's blood. (Tr. 160, 164.)

Plaintiff testified that he always takes his medication; however, he also admitted in his SSI application that he "sometimes forgets to take [his] medication." (Tr. 68, 176.) His treating physicians and emergency room providers consistently urge him to take his medication daily as instructed in order to avoid seizure episodes. (Tr. 135-41.) The Wyckoff ER doctor told him that "medication compliance [was] imperative to prevent seizure." (Tr. 139.) Dr. Eva Hirschenstein gave a guarded prognosis because plaintiff "clearly need[ed] better control." (Tr. 124.) On August 5, 2004, Dr. Lourdes Marasigan, a medical consultant for the SSA, also noted that plaintiff "stated [that] he has frequent seizures but is non-compliant with his medications."

3

(Tr. 126.)

Plaintiff's blood was tested twice to determine if it contained therapeutic[3] concentrations of the antiepileptic drugs. (Tr. 118, 143.) Dilantin is considered therapeutic when it is present in the blood in concentrations between 10.0 micrograms per milliliter (ug/ml) and 20.0 ug/ml. (Tr. 118.) Tegretol is therapeutic at concentrations between 4.0 ug/ml and 12.0 ug/ml. (*Id.*) Plaintiff's blood tests from his April 2004 St. Mary's visit showed therapeutic concentrations of Dilantin (14.9 ug/ml) but sub-therapeutic concentrations of Tegretol (3.9 ug/ml). (*Id.*) Another blood test performed in July 22, 2004 at Betances Medical Health Center showed that plaintiff's blood contained therapeutic concentrations of both drugs, Dilantin (13.0 ug/ml) and Tegretol (5.9 ug/ml). (Tr. 143.)

### 3. Medical Examinations, Test Results, and Diagnoses

All of Plaintiff's physical examinations showed no abnormalities except for some slight injuries that may have resulted during a seizure.[4] Plaintiff's doctors all diagnosed him with generalized seizure disorder. (Tr. 104, 112, 124, 146, 158-59.) The ER doctor at St. Mary's gave a primary diagnosis of breakthrough seizure episodes and generalized seizure disorder (possibly complex partial). (Tr. 104, 112.) Dr. Hirschenstein reported her impression of generalized seizure disorder with possible focal onset. (Tr. 124.) Dr. Daniel Burnham diagnosed plaintiff

---

[3] Having a therapeutic concentration for a given drug means the drug is present in sufficient concentrations in the blood to provide adequate control of seizures. *See* Appendix 1, § 11.00(A).

[4] During his April 2004 St. Mary's stay, his temperature, blood pressure, and urine test results were normal. (Tr. 106-18.) A chest x-ray was unremarkable. (Tr. 120.) Dr. Hirschenstein noted that plaintiff had no weakness or cerebellar deficit, his mental status and cranial nerves were normal, and his sensory exam was normal except for diminished pain in the right foot possibly resulting from injury to the foot during a seizure. (Tr. 124.) Dr. Pandya noted that Plaintiff's physical examination was normal except for some bruises on his hands that resulted from a fall during a seizure episode. (Tr. 158.)

with Hepatitis C and a history of chronic seizures. (Tr. 146.) Dr. Pandya diagnosed plaintiff with seizures and epilepsy that need "to be treated on a daily basis for the rest of his life." (Tr. 159.) The Wyckoff ER doctors diagnosed him as having seizure disorder. (Tr. 158.) Lastly, the Wyckoff ER doctor also gave a secondary diagnosis of anxiety disorder in December 2005 and referred plaintiff to for psychological appointment on January 23, 2006. (*Id.*)

### 4. Residual Functional Capacity Assessments

Two treating physicians, a medical consultant, and an analyst for the SSA assessed plaintiff's residual function capacity ("RFC"). They were generally of the opinion that plaintiff could not drive, work with moving machines, or climb heights and should not be exposed to extreme temperatures. (*See* Dr. Hirschenstein's July 16, 2004 Ltr., Tr. 124; Dr. Marasigan's Aug. 5, 2004 review, Tr. 126; Dr. Pandya Report, Tr. 160-63; and A. Shteyngart's RFC Jan. 14, 2003 Assessment, Tr. 128-31.) Two of the physicians and the analyst found that he could stand and walk for at least six hours each day, carry twenty-five pounds and lift fifty pounds. (*See* Dr. Pandya report, Tr. 160-63 (also noting plaintiff's ability to take public transportation); Dr. Marasigan's review, Tr. 126; Shteyngart Assessment, Tr. 128.) The analyst also found no postural, manipulative, visual or communicative limitations on the plaintiff. (Tr. 128-31.)

Plaintiff claimed on his SSI application that he cannot lift heavy objects or walk alone. (Tr. 66-67.) He also does not drive or travel alone, but walks and takes public transportation daily. (Tr. 64, 62.) He can only walk ten minutes before needing to stop and rest for five to six minutes. (Tr. 67.) He also has concentration and attention problems because his mind is sometimes "consumed with fear of [his] next attack. (Tr. 66-67.) Lastly, he states that his "whole life is consumed and evolves around" his "strong and very violent seizures" because he has to regulate what he can do and where he can go according to them. (Tr. 68.)

### B. Employment & Nonmedical History

Plaintiff completed the ninth grade in 1996, but did not receive additional vocational or special training. (Tr. 52.) He began working in the fields with his family in Puerto Rico, but stopped due to the seizures. (Tr. 79.) From 1996 to 1997, he worked in municipal maintenance where he regularly walked, sat, picked up garbage, and carried garbage bags weighing ten to twenty pounds. (Tr. 72.) He quit this job due to the seizures, and stated he became unable to work beginning October 1, 1997. (Tr. 79, 49.) However, he worked briefly in construction in December 2000 before returning to maintenance work in January 2001 where he walked, stooped, climbed, crouched, crawled, and reached for the full eight hours of his shift. (*Id.*) He also lifted and moved garbage bags and cleaning equipment that normally weighed twenty-five pounds. (*Id.*) Occasionally, he moved bags that weighed fifty pounds. (*Id.*) Plaintiff claimed he stopped working altogether in September 2002; however, he also indicated that he remained at his maintenance job until December 2002. (*Id.*) He remained unemployed in Puerto Rico until he left for New York in 2004. (Tr. 16.)

Upon arrival in New York, plaintiff lived in a transitional home for men. (Tr. 61.) He currently rents a room for $250 per month. (Tr. 173.) He remains unemployed. (Tr. 41-42, 44.) He receives public assistance benefits and foods stamps totaling $352 per month. (*Id.*) Plaintiff testified that he has been denied job opportunities because many employers are "afraid that something can happen while [he] gets one of [his] seizures, and then they can be sued due to it." (Tr. 172.) His daily activities comprise using public transportation or walking to his appointments, the library, or church until evening and upon returning home in the evening, he eats dinner, watches television, reads the Bible, and goes to sleep. (Tr. 62, 64.) He cooks daily with the help of others and shops for food and clothing for an hour twice a week. (Tr. 63, 65.)

### C. Procedural History

Plaintiff applied for SSI on May 21, 2004. (Tr. 43-45.) On August 13, 2004, the SSA denied plaintiff's claim on the grounds that he could still find employment as a maintenance worker. (Tr. 25-28.) A hearing was held on December 27, 2005 before Judge Ruth L. Kleinfeld ("ALJ"). (Tr. 30, 36.) Plaintiff waived his right to an attorney and was represented by an appointed non-attorney representative. (*Id.*) At the hearing, the ALJ questioned plaintiff with the help of an interpreter, and deferred her decision until after plaintiff's psychiatrist appointment on January 23, 2006. (Tr. 176.) The ALJ waited for the psychological report to determine whether plaintiff's anxiety problems in combination with his seizures might be medically equivalent to a listed impairment. (*Id.*)

On July 25, 2006, the ALJ affirmed the Commissioner's denial of benefits and concluded that plaintiff was not disabled within the meaning of the Act at any time through the date of her decision. (Tr. 21.)

## II. Discussion

### A. Standard of Review

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. Pro. 12(c). The Act authorizes the district court to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In this case, the court considers the 12(c) motion within the scope of judicial review under the Act.

Unsuccessful claimants for disability benefits under the Act may bring an action in

federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of the notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). This action was timely filed on October 2, 2006, within 60 days of the Commissioner's final decision on September 15, 2006.

A district court, reviewing the final decision of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998). The former determination requires the court to ask whether "the claim has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)(internal quotations omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999)(quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).

### B. Disability Claims

To receive disability benefits, claimants must be "disabled" within the meaning of the Act. *See* 42 U.S.C. §§ 423(a)&(d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). The claimants bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

The ALJ must conduct a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 404.1520. *See also* 20 C.F.R. § 416.920 (setting forth the same five-step inquiry to evaluate disability of adults). If at any step, the ALJ makes a finding that the claimant is either disabled or not disabled, the inquiry ends there. First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. § 404.1520(b). Second, the ALJ considers whether the claimant has a severe impairment, without reference to age, education, or work experience. To be considered disabled, the claimant must have an impairment, or combination of impairments, which significantly limits his or her physical or mental ability to do basic work activities, and satisfy durational requirements in § 404.1509. 20 C.F.R. § 404.1520(c). Third, the ALJ will find the claimant disabled if his or her impairment meets or equals the impairment listed in Appendix 1. 20 C.F.R. § 404.1520(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's "residual functional capacity" in steps four and five. 20 C.F.R. § 404.1520(e). The "residual functional capacity" is "the most [the claimant] can still do despite . . . limitations." 20 C.F.R. 404.1545(a)(1). The ALJ considers all of the claimant's impairments and symptoms, including pain, that may cause physical or mental limitations. *Id.* In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work." 20 C.F.R. § 404.1520(e). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work which exists in the national economy, considering factors such as age, education, and work experience. If so, the claimant is not disabled. 20 C.F.R. § 404.1520(f). At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work. *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)(citing *Carroll*, 705 F.2d at 642).

### C. Review of ALJ's Findings

Plaintiff's form complaint seeking review of the Commissioner's decision alleges only that the ALJ's decision was "erroneous, not supported by substantial evidence on the record, and/or contrary to law." (Compl. ¶ 9.) In response to the Commissioner's motion, he only asserts that the evidence in the record shows each of his appointments with the neurologist were prompted by seizures, that he has not been able to hold jobs because of his seizures and that he has consistently taken his medications but "constant seizures reduce the levels of medication in his blood significantly. (Pl.'s Aff. in Oppo. to Deft.'s Motion, ECF Dkt. No. 15.) Since *pro se* Plaintiff's objections do not introduce any new evidence and he relies on the record, the court will review each of the five steps in the sequential evaluation process that led the ALJ to deny his claim. In doing so, the Court is mindful that the submissions of *pro se* plaintiffs should be held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe*, 449

U.S. 5, 9 (1980) (citations omitted); *McEachin v. McGuinnis*, 357 F.3d 197 (2d Cir. 2004). The submissions of a *pro se* litigant must be construed liberally and interpreted "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).

The ALJ resolved step one in plaintiff's favor because he had not engaged in substantial gainful activity since October 1, 1997. (Tr. 20.) At step two, she determined that plaintiff's epilepsy constituted a severe impairment while his anxiety did not. (*Id.*) She considered plaintiff's claim of anxiety in conjunction with his claim for epilepsy, and found implausible that his anxiety contributed to his alleged disability. The record does not show anxiety as the cause of any of his limitations and does not contain objective medical evidence of anxiety. (Tr. 17.) Rather, the entire medical record is focused on plaintiff's history of chronic seizures. (*Id.*) The court agrees with the ALJ's findings at each of the initial steps. At steps three through five, the ALJ made findings against plaintiff. As such, the court will examine these steps in greater detail.

   1. **Step Three: Listed Impairment**

The ALJ resolved step three against plaintiff, finding that plaintiff's chronic seizures, though severe, did not meet or equal one of the impairments listed in Appendix 1. The record lacked "documentation of any description of a typical seizure pattern." (Tr. 19.) This finding is supported by substantial evidence.

For a condition to be considered disabling *per se* under step three, it must satisfy each element set out in the definition of a listed impairment. *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); *Brown v. Apfel*, 174 F.3d 59, 64 (2d Cir. 1999). To satisfy the elements for convulsive epilepsy, a listed impairment, a plaintiff must provide a "detailed description of a typical seizure pattern, including all associated phenomena"; have seizures "occurring more frequently than

once a month in spite of at least 3 months of prescribed treatment"; and have either daytime episodes involving the "loss of consciousness and convulsive seizures" or "nocturnal episodes manifesting residuals which interfere significantly with activity during the day." Appendix 1, § 11.02. In providing a detailed description, a physician must "indicate the extent to which description of seizures reflects his own observations and the source of ancillary information." *Id*. Furthermore, "testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available." *Id*.

The record lacks a detailed description of a typical seizure pattern corroborated by either observations of a reporting physician or testimony from a third-party witness. Though a seizure precipitated his visit to St. Mary's in April 2004, he showed no symptoms or seizure activity during his eleven-day stay and all his examinations and laboratory results were normal. (Tr. 103-14, 120-21.) The medical records from his eight separate visits to the Wyckoff ER do not contain a single detailed description of his seizure characteristics, frequency, or other associated phenomena by physicians or a third-party witness. (Tr. 135-39, 141, 152-158.) He claimed to have experienced six seizures in May 2004 and four seizures during his December 2005 Wyckoff stay; however, all those seizures are undocumented in the record. (Tr. 70-71, 158, 171.) Though two treating physicians noted some possible injuries to plaintiff's thumb and foot that resulted from seizures, neither doctor observed nor commented on the frequency or other associated phenomena of the seizures. (Tr. 123, 158.) Plaintiff is the only source of any detailed description of his seizures; even the third-party descriptions of plaintiff's symptoms in one doctor's letter were related to her by plaintiff. (Tr. Tr. 123.) He listed three contacts who can describe his seizures, but did not provide any testimony from them either in the record or at the hearing to corroborate his own descriptions. (Tr. 71.)

The ALJ did not reach the second element of the listing, but there is also insufficient evidence to find that the plaintiff had seizures that occurred more than once a month despite at least three months of prescribed medical treatment. A claimant's adherence to the prescribed medical treatment can be determined from blood levels of antiepileptic drugs. Appendix 1, § 11.00(A). Furthermore,

> *Blood drug levels should be evaluated in conjunction with all the other evidence to determine the extent of compliance*. When the reported blood drug levels are low, therefore, the information obtained from the treating source *should include the physician's statement as to why the levels are low* and the results of any relevant diagnostic studies concerning the blood levels.

*Id.* (emphasis added).

Plaintiff asserts that he has suffered seizures despite taking his medication. However, he has also admitted that he sometimes forgets to take his medication. The record contains numerous instructions from his doctors urging and reminding him to take his medication, and documents at least one instance of non-compliance in August 2004. The two blood test results available are also inconclusive in establishing compliance with his medication requirements over a three-month period. The July 2004 test showed therapeutic levels of both Dilantin and Tegretol in his blood, but the April 2004 test showed below therapeutic levels of Tegretol. Plaintiff claims that his frequent seizures actually reduced the concentration of medication in his blood. This claim is not supported by any medical opinion in the record.[5] Thus, the record does not support a finding that his seizures persisted despite at least three months of prescribed medical treatment.

---

[5] In order to satisfy the second element of convulsive epilepsy, plaintiff needs to present either a statement from a treating physician describing the reductive effect his seizures have on the concentration of medication in his blood, or laboratory test results showing therapeutic levels of both Dilantin and Tegretol for a period of at least three months during which there is a documented pattern of seizures.

## 2. Step 4: Residual Functional Capacity and Past Relevant Work

At step four, the ALJ determined that plaintiff was incapable of returning to his past relevant work in construction and municipal maintenance but still retained the residual functional capacity ("RFC") to perform the full range of medium work as set forth in 20 C.F.R. § 416.945. (Tr. 20, 16.) Medium work involves "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. 416.967(c). Both plaintiff's treating physicians and the agency's consultants and analysts stated that he is capable of lifting or carrying fifty pounds and can frequently lift up to twenty-five pounds. (Tr. 126, 128, 161.) Plaintiff has no other exertional limitations on his ability to stand, walk or sit for at least six hours per day and he is capable of fine manipulation and grasping with his hands. (Tr. 126, 128-31, 160-62.) All assessments are consistent in the limitations they place on plaintiff: no heights, hazardous machines, or driving. (Tr. 131, 126, 124, 162.) The ALJ's conclusion that he could not return to his past work in construction and municipal maintenance but still retained RFC to perform medium work is supported by substantial evidence. *See* 20 C.F.R. §§ 404.1527(c)(1) & (d)(4).

## 3. Step Five: Residual Functional Capacity for Other Work in the National Economy

At step five, the ALJ noted that the burden shifted to the Commissioner to show that plaintiff could perform other work consistent with his age, education, and work experience. She determined that plaintiff's young age and RFC for medium work rendered him capable of performing work that exists in significant numbers in the national economy, and was therefore not disabled. (Tr. 19.) This finding is also supported by substantial evidence.

The Commissioner typically meets his burden at step five by resorting to the applicable vocational guidelines, colloquially known as the "Grids," which factor in the claimant's RFC,

age, education, and work experience to determine whether the claimant is disabled or not. *See* 20 C.F.R. pt. 404, subpt. P, App. 2 ("Appendix 2"); *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (citation omitted). The Grids "only account for exertional limitations, that is, those that relate to 'strength' requirements of jobs such as the claimant's capacity to sit, stand, walk, lift, carry, push, or pull." *Jehn v. Barnhart*, 408 F. Supp. 2d 127, 134 (E.D.N.Y. 2006). When a claimant's exertional limitations are compounded by *significant* non-exertional limitations, the Commissioner must "introduce the testimony of a vocational expert . . . that jobs exist in the economy which the claimant can obtain and perform." *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986)(emphasis added).

The ALJ did not need to call a vocational expert in this case, because plaintiff's non-exertional environmental limitations are not significant. Non-exertional limitations are those that do not implicate the strength required to perform a particular task, such as mental, sensory, and skin impairments or impairments that may impose environmental restrictions on where a person may work. *Jehn*, 408 F. Supp. 2d at 134. Environmental restrictions are those that "result in [the] inability to tolerate physical feature(s) of work settings that occur in certain industries or types of work, e.g., an inability to tolerate dust or fumes." Appendix 2, § 200.00(e). Included in this classification are restrictions against heights, moving machinery, dangers, and driving. *Jehn*, 408 F. Supp. at 134. A non-exertional limitation is considered significant when it results in the "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986).

In a policy statement promulgated to assist ALJs in determining whether a non-exertional limitation is significant, the Commissioner stated that "a person with a seizure disorder who is

restricted from only being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels." SSR 85-15, 1985 WL 56857, at *8 (SSA 1985); *see also Bentinez v. Apfel*, No. 97-cv-4632, 1998 WL 564537, at *6 (E.D.N.Y. July 15, 1998) ("As the ALJ found, plaintiff's seizure disorder simply prohibits him from operating machinery or working at heights. Even with these limitations, he is still fit for a significant number of other jobs."); *Loftin v. Barnhart*, No. 01-cv-1118, 2002 WL 31202760, at *15 (S.D.N.Y. Sept. 3, 2002) (upholding ALJ's determination that plaintiff's restrictions against operating heavy machinery or swimming alone were not significant non-exertional limitations).

The ALJ in this case correctly assessed that plaintiff's environmental limitations against heights, machines, and driving did not significantly limit his employment opportunities and that he "remains able, despite his impairment, to perform work which exists in significant numbers in the national economy [given] favorable vocational factors [including his] age as a younger individual." (Tr. 20.) Thus, her use of the Grids to make a finding of "not disabled" despite plaintiff's need to avoid heights, hazardous machinery, and driving is supported by substantial evidence.

**III.     Conclusion**

The court, having reviewed each step of the ALJ's determinations, finds the Commissioner's final decision to be based on correct principles of law and supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings is granted and this appeal is dismissed in its entirety.

SO ORDERED.

Dated: Brooklyn, New York
         September 30, 2008

_____/s/_____
DORA L. IRIZARRY
United States District Judge